FILED

Oct 15 2024, 9:20 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court





# IN THE
# Court of Appeals of Indiana

In the Matter of J.M. and K.M., Children in Need of Services,

K.R.,

*Appellant-Respondent*

v.

J.M., Sr.,

*Appellee-Respondent*

and

Indiana Department of Child Services,

*Appellee-Petitioner*

and

Kids' Voice of Indiana,

*Appellee-Guardian Ad Litem*

October 15, 2024

Court of Appeals Case No.
24A-JC-202

Appeal from the Marion Superior Court

The Honorable Danielle P. Gaughan, Judge

Trial Court Cause Nos.
49D15-2310-JC-9096
49D15-2310-JC-9097

---

**Opinion by Judge Foley**
Judges Vaidik and Weissmann concur.

**Foley, Judge.**

K.R. ("Mother") appeals the trial court's decision to modify the custody of two of her children, J.M. and K.M. ("the Children"), in lieu of adjudicating the Children as Children in Need of Services ("CHINS"). Mother raises several issues on appeal, which we consolidate and restate as follows:

> I. Whether the trial court misapplied the legal standard for modifying child custody;
>
> II. Whether sufficient evidence supported the decision to modify child custody; and
>
> III. Whether modifying child custody deprived Mother of a meaningful opportunity to engage in CHINS-related services.

We affirm.

## Facts and Procedural History

[3] Mother has a total of five children, including the Children, and J.M. ("Father") is the Children's biological father. On October 23, 2023, the Indiana Department of Child Services ("DCS") filed a petition alleging that all five of Mother's children were CHINS due to domestic violence between Mother and M.W., who resided with Mother and her children and was the father of one of the children. At the time, the Children primarily resided with Mother pursuant to an agreed custody order that was issued in a paternity case. The trial court scheduled the CHINS matter for a fact-finding hearing on December 20, 2023.

[4] On December 18, 2023, two days before the scheduled fact-finding hearing, Father filed a written request to modify custody of the Children. Appellant's App. pp. 98–99. At the ensuing hearing, Mother entered a "mediated admission" that all of her children were CHINS. Tr. Vol. II pp. 32–35. The trial court accepted Mother's admission as to three of the children, however, it did not accept Mother's admission as to the Children, instead proceeding with a hearing on the CHINS petition and Father's request for custody. *See id.* at 35.

[5] At the hearing, two police officers testified about responding to domestic violence incidents between M.W. and Mother in July and October 2023, at which point M.W. had been living with Mother and her children. On each occasion, Mother reported that she and M.W. had an argument that progressed to violence, with M.W. physically striking Mother. DCS personnel testified that Mother did not seem to recognize that she was a victim of domestic violence. She "did not recognize the safety risk as a victim or as a mother to

th[e] Children," and continued to believe that her children were safe with M.W. despite the violence. *Id.* at 92. Evidence was presented that M.W. either "refused or was not interested" in participating in services related to the prevention of domestic violence. *Id.* at 98. The hearing included evidence that M.W. was no longer living with Mother, but Mother continued to live in an apartment where the lease was in M.W.'s name. DCS personnel expressed concern that, "without the intervention of the court," M.W. "w[ould] be back in the home and based on the pattern that's already established . . . there will be future domestic violence incidents that will continue to put the Children at risk for mental health and physical injury." *Id.* at 91.

[6]     As for Father, there was evidence that a DCS representative apprised him of the CHINS allegations and asked him whether he was "in a position to . . . be able to have [the Children] move in with him" if "for any reason something happened in the case that [M]other was not able to care for the Children any longer[.]" *Id.* at 88–89. Father responded that he "he was available to do that, and that he would be willing to get the bunk beds to accommodate that[.]" *Id.* at 89. Father also testified. Father was not concerned about Mother herself posing a safety risk to the Children, *id.* at 120, but he expressed safety concerns based on M.W. being on her lease, *id.* at 107–08. Father said that he wanted child custody so that the Children would "be inside a safer environment." *Id.* at 112. Father also outlined plans for the Children's housing, education, and care.

[7]     At the conclusion of the hearing, the trial court took the matter under advisement. On December 28, 2023, the trial court entered an order (1) finding

that the Children were not CHINS; (2) granting Father's request for custody; and (3) terminating the CHINS matter as to the Children. *See* Appellant's App. Vol. II pp. 18–20. As to custody modification, the court found that "there ha[d] been a substantial change in circumstances that warrant[ed] a modification of custody because of repeated domestic violence incidents between Mother and [M.W.] that place[d] [the Children] at risk while in Mother's care." *Id.* at 20. The court determined that Father should have "sole legal custody and primary physical custody" of the Children, with Mother to receive parenting time consistent with the Indiana Parenting Time Guidelines. *Id.* Mother appeals.

## Discussion and Decision

[8]    Indiana Code section 31-30-1-13 grants CHINS courts concurrent jurisdiction over custody matters, providing the option to resolve CHINS cases through custody modification if appropriate. *See* Ind. Code § 31-30-1-13(d) (providing that an order modifying custody survives the termination of the CHINS case). We review the modification of child custody for an abuse of the trial court's discretion, "with a 'preference for granting latitude and deference to our trial judges in family law matters.'" *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002) (quoting *In re Marriage of Richardson*, 622 N.E.2d 178, 178 (Ind. 1993)). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Fridley v. Fridley*, 748 N.E.2d 939, 941 (Ind. Ct. App. 2001). In conducting our review, we neither reweigh evidence nor assess witness credibility. *In re Marriage of Richardson*, 622

N.E.2d at 179. Instead, we consider the evidence most favorable to the court's judgment, together with all reasonable inferences drawn from that evidence. *Id.*

[9] Where, as here, the trial court entered special findings sua sponte, those findings control only "on the issues or matters covered" by those findings. Ind. Trial Rule 52(D); *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). We review the findings under the clearly erroneous standard. T.R. 52(A); *Yanoff*, 688 N.E.2d at 1262. A finding is clearly erroneous when there is no evidence to support the finding, or when we are left with a definite and firm conviction that a mistake has been made. *See id.* For issues not covered by the trial court's findings, we apply a general judgment standard under which we will affirm if the judgment is sustainable on any legal theory supported by the evidence. *Id.*

## I. Application of Legal Standard

[10] Mother contends that the trial court misapplied the legal standard for modifying child custody. At the outset, we note that a portion of Mother's arguments focus on the timing of Father's request for custody, which was filed two days before the hearing. Mother generally invites us to question the soundness of the custody decision based on the timeframe involved. *See* Appellant's App. Vol. II at 19–20. We note, however, that at no point did Mother object to the timing of Father's request for custody. Moreover, Mother fully participated in the hearing, which included matters related to Father's request. In general, a party waives any challenge to the timeliness of a court submission by failing to object. *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 974 (Ind. 2005). We

therefore conclude that Mother waived any argument premised on the timing of the custody request.

[11] Turning to the applicable law, a court may modify child custody only if doing so is in a child's best interests and there has been a substantial change in one or more of the factors bearing on a custody decision. I.C. § 31-14-13-6. Indiana Code section 31-14-13-2 ("the Custody Statute") sets forth those factors, stating:

> The court shall consider all relevant factors, including the following:
>
> (1) The age and sex of the child.
>
> (2) The wishes of the child's parents.
>
> (3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.
>
> (4) The interaction and interrelationship of the child with:
>
> > (A) the child's parents;
> >
> > (B) the child's siblings; and
> >
> > (C) any other person who may significantly affect the child's best interest.
>
> (5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

Moreover, the party seeking to modify a custody order—in this case, Father—bears the burden of demonstrating that the circumstances support modifying custody. *See In re Paternity of J.T.*, 988 N.E.2d 398, 399 (Ind. Ct. App. 2013).

[12] Directing us to the trial court's custody order, Mother contends that the trial court erred by failing to consider all relevant factors, contrary to the Custody Statute. *See* Appellant's Br. pp. 19–23. We note that, in deciding whether to modify child custody, a trial court need not make specific findings supporting its order, unless a party requested findings under Trial Rule 52. *In re A.R.S.*, 198 N.E.3d 423, 431 (Ind. Ct. App. 2022). Indeed, the plain language of the Custody Statute "only requires a court to 'consider' the factors, not to make a finding regarding each one." *Id.* (quoting *Anselm v. Anselm*, 146 N.E.3d 1042, 1047 (Ind. Ct. App. 2020), *trans. denied*. Here, the trial court entered limited findings without a request from the parties. In this scenario, we presume that the trial court considered all relevant factors, unless the custody order leads us

to conclude that there is an unjustifiable risk that the court did not follow the applicable law. *See Hecht v. Hecht*, 142 N.E.3d 1022, 1031 (Ind. Ct. App. 2020).

[13] In support of its decision to modify child custody, the trial court specifically found that "there ha[d] been a substantial change in circumstances that warrant[ed] a modification of custody because of repeated domestic violence incidents between Mother and [M.W.] that place[d] [the Children] at risk while in Mother's care." Appellant's App. Vol. 2 p. 20. This finding addressed the requirement that, to modify child custody, there must be a substantial change in circumstances related to a factor bearing on a custody decision. Moreover, this finding related to factor (7) of the Custody Statute, which concerns evidence of domestic violence. Further, although the court did not specifically state that modifying custody was in the Children's best interests, it is apparent from the order that ongoing safety risks animated the trial court's decision in this case.

[14] On appeal, Mother specifically argues that the trial court failed to consider the competing wishes of the parents, the Children's wishes, their adjustment to home and school, their relationship with their half-siblings, and the potential effect that modifying child custody would have on the mental health of all involved. *See* Appellant's Br. pp. 21–22. However, the record reveals evidence touching on these factors. Indeed, although the Children's direct wishes were not explicitly stated, evidence was presented about their positive relationship with Father and their need for therapy stemming from their "expos[ure] to situations in the home with [Mother]." Tr. Vol. II p. 118. Moreover, the court heard testimony about the Children's current school arrangements, and Father's

current level of engagement with school-related matters, as well as evidence about Father's plans to enroll the Children in a school near his home. There was also evidence related to the Children's relationships with their half-siblings, with the record reflecting that they had all lived together with Mother. The trial court's ultimate decision to modify custody in favor of Father, despite the potential separation of the Children from their half-siblings—and Mother's desire to maintain the prevailing custody arrangement—suggests that the court weighed these factors against the evidence of ongoing safety risks in Mother's home. We must not reweigh the evidence. *See Kirk*, 770 N.E.2d at 307.

[15] In conclusion, although the trial court did not make express findings on all relevant factors, given the evidence presented and the presumption that the trial court considered all relevant factors, we are unpersuaded that the order evinces an unjustifiable risk that the trial court failed to comply with the applicable law.

## II. Sufficiency of the Evidence

[16] Mother also claims that there was insufficient evidence to modify child custody. *See* Appellant's Br. pp. 19–23. When reviewing the sufficiency of the evidence supporting a custody order, we neither reweigh the evidence nor judge the credibility of witnesses. *Kirk*, 770 N.E.2d at 307. Instead, we view the evidence in the light most favorable to the judgment and consider only the evidence and reasonable inferences therefrom that support the trial court's decision. *Id.*

[17] At times, Mother focuses on the scope of Father's testimony, suggesting that Father failed to meet his burden in seeking custody modification based on the

content of his testimony alone. Yet, our review is not confined to Father's testimony. Rather, our review encompasses the entire body of evidence before the trial court. In this case, the trial court heard testimony from multiple witnesses that supported its decision. That is, two police officers testified about responding to domestic violence incidents between Mother and M.W. in July and October 2023. This evidence directly supported the trial court's finding of "repeated domestic violence incidents between Mother and [M.W] that place[d] [the Children] at risk while in Mother's care." Appellant's App. Vol. II p. 20. Furthermore, DCS personnel testified that Mother minimized the abuse and continued to believe the Children were safe with M.W. despite the violence. This testimony supported the trial court's concerns about the ongoing safety of the Children. There was also evidence that M.W. refused to engage in services related to domestic violence prevention, which further supported the court's concerns about ongoing safety risks in light of M.W.'s status as a leaseholder.

[18] At one point, Mother argues that the issue of domestic violence—which is identified as a factor in the Custody Statute—should not have applied because she was the victim, not the perpetrator. *See* Appellant's Br. pp. 20–21. The Custody Statute refers to "[e]vidence of a pattern of domestic or family violence by either parent," which would not necessarily pertain to Mother. I.C. § 31-14-13-2. Yet, the Custody Statute provides a non-exhaustive list of potentially relevant factors, and caselaw in this area prioritizes the best interests of the child, indicating that a court may consider the effect of domestic violence no matter who is the perpetrator. *See In re N.E.*, 919 N.E.2d 102, 106–107 (Ind.

2010) (involving a CHINS adjudication premised on a parent's failure to protect her children "from ongoing domestic violence between herself and [the perpetrator]," including by failing to cooperate in the prosecution of domestic violence cases against the perpetrator). Next, to the extent Mother disputes whether the Children were actually at risk—pointing to evidence that M.W. no longer lived with her—we note that there was also evidence that M.W. remained on her lease, and that Mother lacked insight into the risk M.W. posed to her children. *See* Tr. Vol. II p. 90. It was the trial court's role to resolve any conflict in the evidence about ongoing safety concerns in Mother's care, and we will not second-guess its determination. *See Kirk*, 770 N.E.2d at 307.

[19] All in all, the trial court determined that there was a substantial change in circumstances based on the ongoing risk of domestic violence and that modifying custody to Father—who expressed his desire for custody and outlined plans for the Children's care—was in the best interests of the Children. Based on the evidence presented, we cannot say the court's decision to modify custody was clearly against the logic and effect of the facts and circumstances.

## III. Opportunity to Engage in Services

[20] Mother contends that she was deprived of a meaningful opportunity to engage in services as a result of the trial court's decision to modify child custody. *See* Appellant's Br. pp. 23–25. Mother also advances several policy concerns about the prudency of modifying child custody in the context of a CHINS case.

At times, Mother directs us to *In re J.B.*, where we stated that one purpose of the CHINS statutes was to "strengthen family life by assisting parents to fulfill their parental obligations[.]" 61 N.E.3d 308, 312 (Ind. Ct. App. 2016) (quoting I.C. § 31-10-2-1(4)). In that case, the trial court determined children were CHINS and, shortly thereafter, DCS asked the court to (1) grant sole custody to the father and (2) close the CHINS case without entering a dispositional decree that would have allowed the mother to participate in services. *Id. at 313.* We expressed concern that the procedures involved failed to "give [the mother] a meaningful opportunity to participate in services[.]" *Id.* We ultimately reversed that portion of the order terminating the CHINS case and we remanded for further proceedings, including "appropriate services" for the mother. *Id.* at 314.

Here, Mother questions whether custody modification furthered the policy objective identified in *J.B.* Moreover, relying on *J.B.*, Mother argues that the instant CHINS case should remain open so she can participate in services. Notably, in *J.B.*, we were especially concerned because DCS sought to change custody and terminate the matter *after* it obtained a CHINS adjudication. *See id.* at 313. We noted that the procedures in that case were "particularly troublesome given that a CHINS adjudication has adverse consequences for parents." *Id.* In this case, however, the court granted Father's custody request in lieu of adjudicating the Children as CHINS. Furthermore, the *J.B.* decision preceded statutory amendments underscoring that CHINS courts have concurrent jurisdiction over matters involving child custody. As we observed in

*M.M. v. Indiana Department of Child Services*, the enactment of that legislation—"in the wake of our decision in *J.B.*"—ultimately "evidence[d] a clear intent by the legislature for a CHINS court to be able to establish or modify custody, child support, or parenting time of a child over whom it exercises jurisdiction." 118 N.E.3d 70, 77 (Ind. 2019).

[23]   At times, Mother essentially asks us to conclude that the trial court should have accepted her admission and adjudicated the Children as CHINS rather than grant Father's request to modify custody. Yet, this position overlooks the legislative intent underlying Indiana Code section 31-30-1-13, which gives CHINS courts the authority to modify custody as an alternative to a CHINS adjudication. *See* I.C. § 31-30-1-13. This provision recognizes that when a suitable parent is willing and able to care for a child, a CHINS adjudication may not be necessary or appropriate. *Cf. K.A.H. v. Ind. Dep't of Child Servs.*, 119 N.E.3d 1115, 1119 (Ind. Ct. App. 2019) (noting that our CHINS statutes are designed to help families in crisis and protect children, not to punish parents); I.C. § 31-35-2-4(d)(5) (establishing adverse consequences for a parent of a child adjudicated a CHINS, specifying that two separate CHINS adjudications can form the basis for a petition to terminate the parent-child relationship).

[24]   Along these lines, to the extent Mother suggests that modifying child custody at an early stage of a CHINS proceeding serves as a barrier to reunification—or that it is otherwise imprudent for a court to modify child custody in the context of a CHINS case—Mother essentially asks us to second-guess the legislature's

decision to authorize custody modification in this scenario. However, these types of public policy arguments are better directed toward the legislature.

[25] Finally, it is worth pointing out that the trial court's decision to modify custody, rather than to adjudicate the Children as CHINS, reflects its consideration of all available evidence, including Father's ability and desire to care for the Children. Accepting Mother's argument would require us to reweigh evidence regarding the Children's need for services under the CHINS statutes, which is inconsistent with our standard of review.[1] *See* I.C. § 31-34-1-1 (establishing scenarios where a child is a CHINS, ultimately requiring that the child "needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court.").

## Conclusion

[26] The order modifying custody of the Children, rather than adjudicating them as CHINS, was supported by the record and reflects adherence to applicable law. To the extent Mother argues that modifying child custody deprived her of a meaningful opportunity to engage in services, this argument is better directed toward the legislature, which has authorized modification in these scenarios.

[27] Affirmed.

---

[1] Further, although the custody modification survives the termination of the CHINS proceeding under Indiana Code section 31-30-1-13(c), the statutory framework does not preclude Mother from seeking modification in the future. Indeed, the custody order is subject to the continuing jurisdiction of the court in the paternity action, which has authority to address future custody issues. *See* Ind. Code § 31-30-1-13(d).

Vaidik, J. and Weissmann, J., concur.

ATTORNEYS FOR APPELLANT

Talisha R. Grifin
Marion County Public Defender Agency
Indianapolis, Indiana

Daniel G. Foote
Foote Law Office
Indianapolis, Indiana


ATTORNEYS FOR APPELLEE INDIANA DEPARTMENT OF CHILD SERVICES

Theodore E. Rokita
Attorney General of Indiana

David E. Corey
Supervising Deputy Attorney General
Indianapolis, Indiana


ATTORNEY FOR APPELLEE J.M., SR.

Don R. Hostetler
Hostetler Law LLC
Indianapolis, Indiana


ATTORNEY FOR APPELLEE KIDS' VOICE OF INDIANA

Katherine Meger Kelsey
Chief Legal Counsel
Indianapolis, Indiana